## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| **AURIGENE PHARMACEUTICAL SERVICES LTD.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**VIRALCLEAR PHARMACEUTICALS, INC. and BIOSIG TECHNOLOGIES, INC.,**<br><br>**Defendants.** | **Civil Action No. 3:21-cv-00031-VLB** |

## AMENDED COMPLAINT

Aurigene Pharmaceutical Services Ltd., by and through its undersigned attorneys, as and for its Amended Complaint against ViralClear Pharmaceuticals, Inc. and BioSig Technologies, Inc., states and alleges as follows:

## THE PARTIES

1.     Plaintiff Aurigene Pharmaceutical Services Ltd. ("APSL" or "Plaintiff") is a duly authorized and validly existing corporation organized under the laws of India, having a principal place of business in Bangalore, India. APSL provides innovator and specialty pharmaceutical companies with pharmaceutical development and manufacturing services.

2.     Upon information and belief, Defendant ViralClear Pharmaceuticals, Inc. ("ViralClear"), is a duly authorized and validly existing corporation organized under the laws of Delaware, having a principal place of business in Westport, Connecticut.

3.     Upon information and belief, Defendant BioSig Technologies, Inc. ("BioSig"), is a duly authorized and validly existing corporation organized under

8

the laws of Delaware, having a principal place of business in Westport, Connecticut.

4.      Upon information and belief, ViralClear is a majority owned subsidiary of BioSig.  ViralClear and BioSig are referred to herein as the "Defendants."

## JURISDICTION AND VENUE

5.      As an action between citizens of this State and citizens or subjects of a foreign state, in a dispute whose amount in controversy exceeds $75,000, this Court is vested with diversity jurisdiction under 28 U.S.C. § 1332(a)(2).

6.      This Court has personal jurisdiction over Defendants because Defendants' principal places of business are in Westport, Connecticut.

7.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and/or § 1391(b)(2) because Defendants' principal places of business are within this judicial district and because a substantial part of the events or omissions giving rise to the claim occurred within this judicial district.

## GENERAL ALLEGATIONS

8.      In connection with ViralClear's efforts to develop an anti-viral agent called merimepodib, as a treatment for COVID-19 (the "Product"), on or about May 20, 2020, ViralClear issued a request for proposal ("RFP"), seeking proposals for the manufacture of 200 kilograms of scale-up batches, and subsequent manufacture of 1,000 kilograms of the intermediate called VRT-754659 along with certain analytical services.

9.      On or about May 22, 2020, ViralClear issued another RFP, seeking proposals for the manufacture of 200 kilograms scale-up batches, and another 1,000

kilograms of the intermediate called VRT-0397536, along with certain analytical services.

10.     On or about June 23, 2020, ViralClear accepted and countersigned APSL's proposal to manufacture the 200 kilogram scale-up batches of each of the two intermediates, agreeing to pay APSL a total of $830,000.

11.     On or about July 16, 2020, ViralClear and BioSig both accepted and countersigned APSL's proposal to manufacture 1,000 kilograms of each of the two intermediates, agreeing to pay APSL a total of $3,175,000 in three milestone payments, including a $700,000 milestone to be paid when APSL initiated the manufacturing campaign, which was intended to cover APSL's procurement of the raw materials necessary to manufacture the intermediates.

12.     The proposal executed by ViralClear on June 23, 2020 and the proposal executed by ViralClear and BioSig on July 16, 2020 are referred to herein as the "Contracts."

13.     Pursuant to the Contracts, APSL began the work, including purchasing raw materials from its suppliers, manufacturing the intermediates, and performing the requested analytical services.

14.     In September 2020, while that work was in process, ViralClear advised APSL that it wanted to put the project under the second proposal on hold.

15.     By that time, APSL had already commenced manufacturing the initial 200 kilogram batches of intermediaries that was the subject of the June 23, 2020 executed proposal, and was already performing the remaining analytical work regarding that batch of intermediaries.

16.     By that time, APSL had also already arranged with its vendors and suppliers to procure the raw materials, book the manufacturing slot and take other preparatory actions necessary to manufacture the 1,000 kilogram batch of intermediaries that was the subject of the July 16, 2020 executed proposal.

17.     The parties discussed the status of the work, and on or about September 21, 2020, ViralClear instructed APSL to complete the remaining analytical work regarding the initial 200 kilogram batches, and agreed that it would pay APSL the full amount under the June 23, 2020 executed proposal.  ViralClear also agreed that it would reimburse APSL for the costs of the raw material APSL had acquired in preparation to manufacture the 1,000 kilogram batch of intermediaries that was the subject of the July 16, 2020 executed proposal.  At ViralClear's request, APSL agreed to accept the agreed-upon payments pursuant to a longer payment schedule that was required under the Contracts.

18.     In accordance with ViralClear's instructions, APSL continued to perform the remaining agreed-upon analytical work on the 200 kilogram batches of the two intermediaries.  Upon completion of the analytical work, APSL supplied 1 kilogram of each intermediate as sample to ViralClear.

19.     On or about September 29, 2020, ViralClear expressly acknowledged that APSL had completed the large majority of the remaining agreed-upon work, and instructed APSL to invoice ViralClear in the amount of $1,400,000, which included (a) the majority of the payments due under the June 23, 2020 executed proposal for its work on the 200 kilogram batches, and (b) the $700,000 first milestone payment under the July 16, 2020 executed proposal, which APSL expended to procure the raw material for the 1,000 kilogram batches pursuant to the July 16, 2020 executed

8

proposal. In addition to the $1,400,000, ViralClear also agreed to pay APSL an additional $130,000, which would be invoiced by APSL upon delivery of the 200 kilogram batches.

20.     On or about September 30, 2020, APSL issued an invoice to ViralClear in the amount of $1,400,000. Pursuant to the agreed-upon payment schedule, ViralClear was required to pay $98,800 immediately, and make three additional monthly payments.

21.     ViralClear failed to pay APSL any portion of the $1,400,000.

22.     Upon information and belief, in or about October, 2020, without APSL's knowledge and by improper means and with improper motive, BioSig intimidated ViralClear with the purpose of causing ViralClear to breach the Contracts by replacing the ViralClear employees involved in the Contracts with a "wind-down team" comprised of BioSig employees, led by Todd Wiltshire, BioSig's Senior Vice President.  The replacement of the ViralClear employees with BioSig employees was in complete disregard of the separate corporate form, and in essence, made ViralClear, in form and substance, no more than a division of BioSig.

23.     On or about October 26, 2020, BioSig, through its "wind-down team" comprised of BioSig employees, halted ViralClear's work on the Product.

24.     In its Form 10-Q for the period ending September 30, 2020, BioSig disclosed that, "[o]n October 26, 2020, BioSig Technologies, Inc. halted ViralClear's signal finding Phase 2 trial, 'A Phase 2, Randomized, Double-Blind, Placebo-Controlled Study of the Efficacy and Safety of Oral Merimepodib in Combination with Intravenous Remdesivir in Adult Patients with Advanced Coronavirus Disease 2019 (COVID-19),' . . . and is reviewing repurposing ViralClear." BioSig further

8

disclosed that "[t]he Company expects to incur costs in connection with the winddown of the Phase II trial and the associated regulatory reporting in final quarter of 2020."

25.     On or about October 30, 2020, ViralClear advised APSL that it had halted work on its development of the Product and instructed APSL to cease all work on the project. Upon information and belief, this action was taken by ViralClear at the direction of BioSig. ViralClear also instructed APSL to submit any remaining invoices for payment.

26.     On or about October 30, 2020, representatives of APSL participated in a telephone conference with Mr. Wiltshire, BioSig's Senior Vice President, regarding ViralClear and the Contracts. APSL explained the Contracts and ViralClear's agreement that APSL has performed the work and would be paid therefor.

27.     APSL complied with Defendants' instructions, and ceased working on the only portion of the work that remained outstanding – preparation for the delivery of the 200 kilogram batches.  APSL had already spent $130,000 necessary to perform that work, in reliance on ViralClear's agreement that that amount would be paid along with the $1,400,000 in accordance with the Contracts.

28.     On or about November 9, 2020, in accordance with Defendants' instructions, APSL resubmitted the invoice for $1,400,000, and submitted an invoice for the $130,000 it expended in performing the work requested by ViralClear.  At that time, APSL provided Mr. Wiltshire with the invoices and a copy of the email in which ViralClear had confirmed its agreement to pay.

29.     Upon information and belief, BioSig, by improper means and with improper motive, caused ViralClear to honor the Contracts and ViralClear's

8

subsequent confirmation that it would pay APSL $1,530,000 for the work performed, and caused ViralClear to refuse to pay APSL's invoices.

30.     On November 10, 2020, ViralClear refused to pay those invoices and, through its attorneys, disclaimed any obligation to pay and disclaimed any intent to pay any amount in the future.

## COUNT ONE – BREACH OF CONTRACT
### (Against ViralClear)

31.     APSL repeats and realleges the allegations of paragraphs 1 through 30 as if fully set forth herein.

32.     The Contracts are valid and binding contracts between APSL and ViralClear.

33.     APSL complied with the Contracts and performed its obligations under the Contracts.

34.     ViralClear breached the Contracts as described herein.

35.     As a result of the aforesaid breach by ViralClear, APSL has been damaged in the amount of at least $1,530,000.

## COUNT TWO – BREACH OF CONTRACT
### (Against BioSig)

36.     APSL repeats and realleges the allegations of paragraphs 1 through 35 as if fully set forth herein.

37.     The July 16, 2020 executed proposal is a valid and binding contract between APSL and BioSig.

38.     APSL complied with the July 16, 2020 executed proposal and performed its obligations under that contract.

39.     BioSig breached the contract as described herein.

8

40.     As a result of the aforesaid breach by BioSig, APSL has been damaged in the amountof at least $700,000.

## COUNT THREE – BREACH OF CONTRACT
### (Against BioSig based on an alter ego theory of liability)

41.     APSL repeats and realleges the allegations of paragraphs 1 through 40 as if fully setforth herein.

42.     The Contracts are valid and binding contracts between APSL and ViralClear.

43.     ViralClear breached the Contracts as described herein.

44.     APSL complied with the Contracts and performed itsobligations under the Contracts.

45.     As further alleged herein, BioSig was the alter ego of ViralClear, and there exists, and at all times herein mentioned has existed, a unity of interest and/or ownership between Defendants such that any separateness between them has ceased to exist.

46.     Upon information and belief, ViralClear is, and at all relevant times was, controlled and dominated by BioSig such that BioSig and ViralClear operated as a single economic entity, in that, among other facts: (i) BioSig owns a majority of the outstanding shares of ViralClear; (ii) ViralClear is undercapitalized for purposes of honoring its obligations under the Contracts; (iii) ViralClear is merely a façade for the operations of its parent corporation, BioSig, as evidenced by its complete dominance and control in ViralClear's affairs and BioSig's insertion of BioSig executives into leadership roles at ViralClear; (iv) BioSig's failure to observe corporate formalities, as evidenced by among other things, BioSig's replacement of ViralClear employees; and (v) ViralClear serves no legitimate purpose and is a mere

shell for the parent corporation, BioSig, used primarily as an intermediary to promote and/or perpetuate a fraud or injustice on APSL– namely, by leading APSL to believe that ViralClear would pay APSL's invoices, but subsequently reneging on the promise.

47.    As a result of the aforesaid breaches, APSL has been damaged in the amount of at least $1,530,000.

### COUNT FOUR – TORTIOUS INTERFERENCE WITH CONTRACT
### (Against BioSig regarding the June 23, 2020 Executed Proposal)

48.    APSL repeats and realleges the allegations of paragraphs 1 through 47 as if fully set forth herein.

49.    The June 23, 2020 executed proposal is a valid and enforceable contract between APSL and ViralClear.

50.    BioSig was aware of the contractual relationship between APSL and ViralClear.

51.    As described herein, BioSig intentionally, without justification, and by improper means and with improper motive, induced Viral Clear to breach its contract with APSL.

52.    As a result of the aforesaid actions by BioSig, APSL has been damaged in the amount of at least $830,000.

### COUNT FIVE – TORTIOUS INTERFERENCE WITH CONTRACT
### (Against BioSig regarding the July 16, 2020 Executed Proposal)

53.    APSL repeats and realleges the allegations of paragraphs 1 through 52 as if fully setforth herein.

54.     If BioSig is found not to be a party to the July 16, 2020 executed proposal, the July 16, 2020 executed proposal is a valid and enforceable contract between APSL and ViralClear.

55.     BioSig was aware of the contractual relationship between APSL and ViralClear.

56.     As described herein, BioSig intentionally, without justification, by improper means and with improper motive, induced Viral Clear to breach its contract with APSL.

57.     As a result of the aforesaid actions by BioSig, APSL has been damaged in the amount of at least $700,000.

### DEMAND

WHEREFORE, APSL hereby demands judgement against Defendants:

A.     Awarding APSL damages in the amount of $1,530,000, plus pre-judgment interest;

B.     Awarding APSL its reasonable attorney's fees it has incurred in this action, and all other reasonable costs and expenses incurred prosecuting this action; and,

C.     Such other and further relief that this Court deems just and proper.

Dated: May 3, 2021
Redding, Connecticut

Toby S. Soli (ct-18697)
GREENBERG TRAURIG, LLP
200 Park Avenue
New York, NY 10166
Tel: (212) 801-9200
Fax: (212) 801-6400
Email: solit@gtlaw.com

8

**Of Counsel:**

**Eric D. Wong**
**GREENBERG TRAURIG, LLP**
**500 Campus Drive, Suite 400**
**Florham Park, New Jersey 07932**
**Tel: (973) 360-7900**
**Fax: (973) 301-8410**
**Email: WongE@gtlaw.com**

*Attorneys for Plaintiff*
*Aurigene Pharmaceutical Services Ltd.*

8